# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| JAYRADO WALLER, MARCIA WALLER<br><br>　　　　　　　Plaintiffs,<br><br>　v.<br><br>CITY OF MIDDLETOWN, MARK DEL MAURO, NICHOLAS PUORRO, WILLIAM HERTLER, DOUGLAS CLARK, FRANK SCIRPO<br><br>　　　　　　Defendants. | 3:11-CV-01322 (CSH)<br><br><br>**September 29, 2014** |

## RULINGS ON MOTIONS FOR SUMMARY JUDGMENT

**HAIGHT**, Senior District Judge:

Attempting to apprehend the suspect of a violent crime named in an arrest warrant, officers of the Middletown Police Department forced entry into a small residential apartment, where they believed the suspect to be present and living. The suspect was no where to be found, and the apartment, as it turned out, was not the residence of the suspect, but the home of Plaintiff Jayrado Waller. This is an action for damages arising from that incident.

Jayrado and his conservator, Marcia Waller (collectively, "Plaintiffs") have filed this lawsuit against Defendants City of Middletown (the "City"), detective Mark Del Mauro, detective Nicholas Puorro, officer Douglas Clark, officer William Hertler, and officer Frank Scirpo (collectively, "Officers"). In Count One of the amended complaint, which charges the Officers, and Count Two, which charges the City, Plaintiffs allege that Jayrado was deprived of his rights under the Fourth and Fourteenth Amendments to be free from unreasonable searches or seizures, in violation of 42 U.S.C. § 1983. In Count Three, Plaintiffs allege that the Officers deprived Jayrado of his parallel right to

be free from unreasonable searches or seizures under Article First, § 7 of the Connecticut Constitution. In Counts Four and Five, Plaintiffs charge the Officers with trespass and intentional infliction of emotional distress, respectively. Plaintiffs charge both the Officers and the City with negligent infliction of emotional distress in Count Six. Doc. [48].

This case is before the Court on separate motions for summary judgment filed by Hertler and Scirpo (Doc. # 90), the City (Doc. # 87), and Clark, Del Mauro and Puorro (Doc. # 89) pursuant to Rule 56 of the Federal Rules of Civil Procedure. Plaintiffs oppose the motions. This Ruling decides them.[1]

## I.  BACKGROUND

The following facts are undisputed except where otherwise noted.

On March 16, 2010, the Middletown Police Department obtained a warrant for the arrest of Shamaz Perry, who was one of five individuals believed to be involved in the robbery and violent assault of Justin Molinaro. Doc. [92-3]. The arrest warrant indicated that Perry resided at 1421 Washington Street, in Middletown. *Id.* On March 18, 2010, Detectives Puorro and Del Mauro proceeded to the Stop and Shop grocery store in Cromwell, where they believed Perry was working. Doc. [92-2]. The detectives learned that Perry was not scheduled to work that day, but the store manager provided the detectives with what the detectives came to believe was Perry's current address: 1189 Washington Street, Apartment D-11, Middletown. Doc. [92-2]. That address comported with information the detectives had received from Molinaro and confidential informants that Perry resided somewhere in the "Sagamore Hills (#1151 and #1189 Washington Street) area,"

---

[1]Defendants have also filed a motion to dismiss Counts Two, Three, Five and Six of Plaintiffs' complaint, pursuant to Rule 12(b)(6), Federal Rules of Civil Procedure, for failure to state a claim upon which relief can be granted. That motion is resolved in part IV of this Ruling.

which were the addresses of the two buildings of the Sagamore Hills apartment complex.  Doc. [92-2]; Doc. [106-1] Ex. C at 15.  The detectives proceeded immediately to 1189 Washington Street. Doc. [92-2].  Upon arrival, they noticed a burgundy 1995 Nissan Maxima in the parking lot, which the Officers claim was registered to Perry's relative, Doris Perry.  Doc. [92-2].  A car matching that description was identified in the arrest warrant for Perry as the vehicle used in connection with assault and robbery of Molinaro.  *Id.*

Detectives Del Mauro and Puorro, along with Officers Clark, Hertler and Scirpo who had also been called to scene, made their way into the apartment building using keys or a pass code that had been provided to them by the management of the apartment complex.  Doc. 48 at ¶¶ 17-18; Doc. [106-1] Ex. A at 45; Doc. [106-1] Ex. C at 17-20.  Once inside, they proceeded to the door of what eventually proved to be Jayrado's apartment, on the fourth floor of the building.  Doc. [48] at ¶ 20. They smelled marijuana and heard people speaking with each other inside the apartment unit.  Doc. [92-2];  [106-1] Ex. A at 56, 67.  They called out for the door to be opened, but when it became apparent that no response was forthcoming, they knocked down the door with a battering ram.  Del Mauro, Puorro and Clark then entered inside to search the apartment.  Hertler and Scirpo remained in the hallway.  Doc. [93-10] at 54.  The television was on at medium volume but no one was in the apartment.[2]  Doc. [99-2].

---

[2]An Xbox Live video game system was connected to the television and left in the on position. The device allows one to play online multi-player games with other users connected elsewhere, and includes a headset feature so that users can play the game with each other and communicate concomitantly.  *See* Ed Grabianowski and Stephanie Crawford, *How Xbox Live Works*, HowStuffWorks.com, Feb. 2, 2006, http://electronics.howstuffworks.com/xbox-live.htm. Jayrado testified that the voices of friends, with whom he was engaged in this game, could be heard like "regular people taking through the TV." Doc. [106-1] Ex. H at 45.  This accounts for the voices the Officers heard coming from inside the apartment unit.

The parties dispute much of what happened next.  Although both sides agree that the Officers ultimately determined that Jayrado was not the suspect they were looking for, Plaintiffs claim that the Officers reached this determination only after they patted down or searched Jayrado's person. Doc. [14] at ¶ 12; Doc. [92-15] at 5; Doc. [106-1] Ex. H at 25.  Further, Jayrado, who has been diagnosed with attention deficit hyperactivity disorder, and bipolar disorder, claims that he was derided by each of the Officers for expressing to them his desire at this time to contact his mother, Marcia.  Doc. [48] at ¶ 27; Doc. [106-1] Ex. H at 26-27; 46.  Plaintiffs also claim that when Jayrado entered the apartment, he discovered that the Officers' search of the unit had resulted in damage to his personal property, including the destruction of certain electronic devices.  Doc. [48] at ¶ ¶ 31, 61; Doc. [106-1] Ex. G at 43-44.

After the incident, Jayrado claims that his "moods shifted a lot more," that he became "on edge" and felt unsafe in public and subject to harassment by the police.  Accordingly, his health care provider increased the dosages of the medications he was taking, Ambien (for sleep) and Depakote and Risperdal (for bipolar disorder).  Doc. [106-1] Ex. H at 46-48.  Marcia claims that the ordeal left her son "traumatize[d]."  Doc. [106-1] Ex. I at 27.

Plaintiffs seek compensatory damages for Jayrado's emotional distress and destroyed property, punitive damages against the Defendants, and a written apology from the Officers and the City of Middletown.  Doc. [48] at 11.

## II.  STANDARD OF REVIEW

A motion for summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."

4

Fed.R.Civ.P. 56(c).

Summary judgment is appropriate if, after discovery, the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "The burden is on the moving party 'to demonstrate the absence of any material factual issue genuinely in dispute.'" *Am. Int'l Group, Inc. v. London Am. Int'l Corp.*, 664 F.2d 348, 351 (2d Cir. 1981) (quoting *Heyman v. Commerce & Indus. Ins. Co.*, 524 F.2d 1317, 1319–20 (2d Cir. 1975)).

A dispute concerning a material fact is genuine "'if evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir. 1992) (quoting *Anderson v. Liberty Lobby, In.,* 477 U.S. 242, 248 (1986)). The Court must view all inferences and ambiguities in a light most favorable to the nonmoving party. *See Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir. 1991). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Id.*

## A.  Officers Liability under 42 U.S.C. § 1983

Plaintiffs charge the Officers in Count One with deprivation of his right to be free from unreasonable searches under the Fourth and Fourteenth Amendments in violation of 42 U.S.C. § 1983. Section 1983 does not itself provide a source of substantive rights, but instead provides the mechanism by which a plaintiff may seek vindication of federal rights conferred elsewhere. *Graham v. Connor*, 490 U.S. 386, 393-94 (1989). "To prevail on a § 1983 claim, a plaintiff must establish that a person acting under color of state law deprived him of a federal right." *Thomas v. Roach*, 165 F.3d 137, 142 (2d Cir. 1999). The Fourth Amendment, on which Plaintiffs' section 1983 claim is predicated, reads as follows:

> The rights of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.[3]

U.S. Const. amend. IV.  Plaintiffs claim that the following actions by the Officers violated Jayrado's right against unreasonable searches and seizures in violation of the Fourth Amendment: the Officers' entry into the common hallways of the apartment building; the Officers' entry into Jayrado's individual apartment unit ("Apartment D-11"); the Officers' search of Apartment D-11, which resulted in damage to Jayrado's personal property; and the Officers' search of Jayrado's person. Although Hertler and Scirpo, who broached only the common areas of the apartment building, have moved separately from their counterparts, Clark, Del Mauro and Puorro who entered Apartment D-11, both motions for summary judgment raise essentially the same arguments: that their entry into the building or Apartment D-11 was lawful, that they did not search Jayrado's person, and that, in any event, they are entitled to qualified immunity.

"Qualified immunity protects officials from liability for civil damages as long as 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Gilles v. Repicky*, 511 F.3d 239, 243 (2d Cir. 2007) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  "In general, public officials are entitled to qualified immunity if (1) their conduct does not violate a clearly established right, or (2) it was objectively reasonable for them to believe that their acts did not violate those rights.  The availability of the defense depends on whether a reasonable officer could have believed his action to be lawful, in light

---

[3]The Fourth Amendment's search and seizure provisions are applicable to the states via the Fourteenth Amendment.  *See Tenenbaum v. Williams*, 193 F.3d 581, 602 n. 14 (1999).

of clearly established law and the information he possessed." *Weyant v. Okst*, 101 F.3d 845, 856 (2d Cir. 1996). With respect to the first element, the parties do not dispute that Plaintiffs have alleged a "clearly established" constitutionally protected right, that is, the Fourth Amendment right to be free from unreasonable searches and seizures   The Court therefore considers in the first instance, only whether the Officers violated those clearly established rights, and if so, whether it was objectively reasonable for them to believe that their actions were lawful.

### 1. Entry into Common Hallways

Plaintiffs first contend that the Officers violated Jayrado's constitutional rights when they entered through the locked doors of the apartment building. The Second Circuit has held that "common halls and lobbies of multi-tenant buildings are not within an individual tenant's zone of privacy even though they are guarded by locked doors." *United States v. Holland*, 755 F.2d 253, 255 (1985). "This rule" the Second Circuit explained, "gives tenants the benefit of much-needed police protection in common hallways," and "protects [police] against potential civil liability under 42 U.S.C. § 1983 resulting from an erroneous determination as to whether the door to a tenant's 'home' is his apartment door or a door at the end of a common hallway." *Id.* at 256. Therefore, when the Officers entered the apartment building in this case they were permitted to do so because of the established law relating to common hallways in this Circuit. Although not required, they also had the standing consent of the apartment management to enter the common hallways of the building to conduct police business and were given a key or pass-code for that purpose. Doc. [106-1] Ex. C at 18-19. There is, as a result, no basis to conclude that the Officers violated Jayrado's Fourth Amendment interests by entering the apartment building.

### 2. Entry into Apartment D-11

Plaintiffs next claim that Clark, Del Mauro and Puorro unlawfully entered Apartment D-11, and that Hetler and Scirpo, who remained in the hallways but did enter the unit, are liable because they failed to intervene to prevent the constitutional violations of their fellow officers.  Plaintiffs contend that there are genuine issues of material fact as to whether Clark, Del Mauro and Puorro reasonably believed that Perry, the individual named in the warrant and for whom the Officers were seeking, resided in and was present at Apartment D-11 in the Sagamore Hills complex.

Where as here, police do not have a search warrant for a particular residence, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives, or in which the officer reasonably believes him to live, when there is reason to believe that the suspect is within the residence.  *See Payton v. New York*, 445 U.S. 573, 603 (1980); *see also Steagald v. United States*, 451 U.S. 204, 221 (1981); *United States v. Terry*, 702 F.2d 299, 319 (2d. Cir.) *cert. denied*, 461 U.S. 931 (1983).  The rationale is that where "there is sufficient evidence of a citizen's participation in a felony to persuade a judicial officer that [the suspect's] arrest is justified, it is constitutionally reasonable to require him to open his doors to the officers of the law."  *Payton*, 445 U.S. at 602-03.  In *Steagald* v. *United States*, which Plaintiffs argue "governs this case," the Supreme Court drew the narrower distinction, that, in the absence of exigent circumstances or consent, police officers may not enter the home of a third party pursuant to an arrest warrant based on the belief that the suspect named in the arrest warrant might be a *guest* in that residence.  451 U.S. at 213-14; Doc. [104] at 3.

Unlike the police in *Steagald*, however, the Officers in this case were not of the belief that Perry was *visiting* Jayrado's apartment; rather, they believed, albeit mistakenly, that Perry *lived at that apartment* and that he was *within the apartment* at the time they endeavored to effectuate the

arrest warrant.  Entry by officers into a dwelling under a mistaken belief does not amount to a constitutional violation so long as the belief was reasonable.  *See U.S. v. Lovelock*, 170 F.3d 339, 343 (2d Cir. 1999) ("What a citizen is assured by the Fourth Amendment . . . is not that no government search of his house will occur . . . but that no such search will occur that is *unreasonable*." (Internal quotation marks omitted; emphasis added)).  Rather, as noted earlier, "the proper inquiry is whether there is a *reasonable belief* that the suspect *resides at the place* to be entered to execute an arrest warrant, and whether the officers have *reason to believe* that the *suspect is present*."  *United States v. Lauter*, 57 F.3d 212, 215 (2d Cir. 1995) (some emphasis added).

Plaintiffs argue that deficiencies in the present record preclude the conclusion that the Officers' belief was reasonable because the "*only piece of evidence*" that shows that Perry lived at Apartment D-11 — a document in his employee file at Stop & Shop — is *not* in the record.  Doc. [104] at 5 (emphasis added).  Deposition testimony from any Officer who says the address of Apartment D-11 was shown on the document is inadmissible, the argument goes, because under the "best evidence rule" as embodied in Fed. R. Evid. 1002, that document *and only that document*, may establish its contents.[4]  As an initial matter, this argument ignores the fact that the document in question is *not the only evidence* in the record that establishes the Officers reasonable belief that Perry resided at Apartment D-11— the record contains an admissible police report, created on the day the Officers viewed the document, which states "[t]he manager on duty provided detectives with the address of #1189 Washington Street Apartment D11 as the current address that Perry has listed on his employee file as his residence."  Doc. [92-2].  The deficiency Plaintiffs perceive in the record

---

[4]Fed. R. Evid. 1002, states in its entirety: "An original writing, recording, or photograph is required in order to prove its content unless these rules or a federal statute provides otherwise."  *Id.*

is simply not there.

Plaintiffs proceed from that faulty premise and digress yet further to the "best evidence rule," from which they draw the proposition that the Officers "are required to produce this document" in order to "prove [its] contents . . . i.e. that the [document] contained the words 1189 Washington Street, Apartment D11 or something that can reasonably be mistaken for that address."[5]  Doc. [104]. at 6.  Plaintiffs' reliance on the "best evidence rule" is inapposite.  The contents of the document are not an issue here, only what the Officer *thought was shown on the document*.  No rule of evidence precludes the admission of an officer's deposition testimony concerning what he thought he saw on the document.  The Court will consider it.

On balance, the Officers' belief that Perry resided at Apartment D-11 was reasonable.  This address, which they received from Perry's employer, was corroborated by reports from confidential informants, and Molinaro himself, which indicated that Perry resided in the "Sagamore Hills (# 1151 and # 1189 Washington Street) area."  Doc. [92-2].  In addition, by the time Officers searched for Perry at this address, they had already determined that Perry was not living or residing at Grand Street or Grove Street, two areas where detectives had reason to believe they might find Perry.  Doc. [99-2]; Doc. [106-1] Ex. A at 33.  The fact that detectives had exhausted other leads before searching the 1189 Washington Street address could have reasonably contributed to their belief that Apartment D-11 was Perry's place of residence.  Finally, when the Officers arrived at the address, they found in the parking lot a car matching the description of the vehicle identified in the arrest warrant that was believed to be connected to the assault and robbery of Molinaro.  *Id.*

---

[5]Fed. R. Evid. 1002, states in its entirety: "An original writing, recording, or photograph is required in order to prove its content unless these rules or a federal statute provides otherwise."  *Id.*

The Officers also had reason to believe that Perry was present at the apartment when they attempted to arrest him.  Not only was the car he had been driving found in the parking lot, but when Officers approached the door of Apartment D-11 they head voices coming from the inside.  Jayrado testified that his Xbox Live was left in the on position so that the voices of his friends, with whom he was engaged in online game-play, could be heard like "regular people taking through the TV." Doc. [106-1] Ex. H at 45.  The Officers also smelled marijuana emanating from the apartment, which provided the Officers with a reasonable belief that someone was inside smoking it.

Plaintiffs nevertheless argue that the Officers should have done more in the way of verifying that Perry resided at Apartment D-11 and that he was present when they sought to arrest him; that for example, they should have confirmed that Perry leased the apartment or waited for Perry to return home and enter the building.  Doc. [104] at 8, 12-13.  The Officers, however, were not required to conduct further inquiry.  Their belief that Perry resided at Apartment D-11 and was present when they sought to effectuate his arrest needed to be only *reasonable*.  As the Second Circuit resolved, this is a less stringent standard than the probable cause requirement.  *United States v. Lauter*, 57 F.3d at 216 (stating that officers' belief that the residence to be entered is the home of the person name in the arrest warrant need not be supported by 'probable cause').  The rule may be different in other Circuits; *see United States v. Gorman*, 314 F.3d 1105, 1112 (9th Cir. 2002) (holding that "the 'reason to believe,' or reasonable belief, standard of *Payton* . . . embodies the same standard of reasonableness inherent in probable cause").  Applying Second Circuit authority in the case at bar, I am satisfied that the Officers operated with the requisite reasonable belief in this instance, and hence, did not deprive Jayrado of a right protected by the Constitution when they entered his home.

3.      **Protective Sweep of Apartment D-11**

Plaintiffs advance the alternative theory that even if Clark, Del Mauro and Puorro lawfully entered Jayrado's apartment, they violated his constitutional rights through an unreasonable search or, "protective sweep," of his home.  "When arresting a person in a residence, officers may perform a protective sweep incident to the arrest to protect themselves or others."  *United States v. Lauter*, 57 F.3d at 216.  In *Maryland v. Buie*, 494 U.S. 325, 334 (1990), the Supreme Court held that during an arrest, officers may, "without probable cause or reasonable suspicion[] look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched."  *Id.*  A "protective sweep, aimed at protecting the arresting officers . . . is . . . not a full search of the premises, but may extend only to a cursory inspection of those spaces where a person may be found."  *Id.* at 335; *see also United States v. Miller*, 430 F.3d 93, 97-98 (2d Cir. 2005).  It may "last[] no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises."  *Id.* at 335-36; *see also United States v. Oguns*, 921 F.2d 442, 447 (2d Cir. 1990) ("Once police eliminate the dangers that justify a security sweep . . . they must, barring other exigencies, leave the residence.").

Plaintiffs argue that the protective sweep of Jayrado's apartment was unreasonable both in terms of duration and degree.  The Officers "alleged protective sweep," Plaintiffs claim, "lasted upwards of three minutes," and the Officers "ransacked" the apartment. Doc. [104] at 14; Doc. [105] at 4.  The Officers claim that their search of the apartment took "a mere two to three minutes" and that they left the apartment and its effects undamaged.  Doc. [91] at ¶ 55.  A protective sweep of a small apartment lasting "upwards of three minutes" may be probative under certain circumstances of an unreasonable search and seizure; however, Plaintiffs' claim that the search lasted that long is

not supported by the record citation they have provided this Court (nor, for that matter, does the contention appear to be supported elsewhere in the record).  Plaintiffs cite only to pages 71 and 72 of the deposition transcript of Puorro who stated that police searched the apartment for "a minute or two, three minutes."  Doc. [106-1] Ex. A at 71.  No where in that portion of the deposition does Puorro claim, as Plaintiffs assert, that the search lasted *upwards* of three minutes.  "A party asserting that a fact . . . is genuinely disputed must support the assertion by citing to particular parts of materials in the record, including depositions."  Fed. R. Civ. P. 56(c)(1)(A).  Having failed to do so, the fact is considered undisputed for purposes of this motion.  *See* Fed. R. Civ. P. 56(e)(2) ("If a party fails to properly support an assertion of fact . . . the court may . . . consider the fact undisputed for purposes of the motion.").  The Court therefore concludes that the Officers' protective sweep of Apartment D-11 lasted two to three minutes, and no more.

The Plaintiffs claim, in any event, that once inside in the apartment, the Officers did more than just a cursory inspection of the apartment; rather, they searched for Perry in places within the apartment wherein he could not possibly have been hiding, and in the process, damaged the apartment and property within.  The Officers deny that they damaged Jayrado's personal property and dismiss Jayrado's testimony on this score as "fanciful."  Doc. [112] at 8.  At his deposition, Jayrado described the state of his apartment and his personal effects as follows:

> My couches were flipped over. . . . [M]y table was broke.  My Xbox controllers were stomped on, like literally stomped on.  And my Xbox console, the back piece . . . was . . . separated.  They tried to say people hide drugs in Xboxes.  So . . . they broke one of my HDMI cords . . . They took it out when they pulled the Xbox.  And the little piece got stuck in the TV.  So that broke the cord and broke the TV at the same time. . . .  And then my shoes . . . got all . . . demolished. . . . [T]here's just wood chips all in them . . . and they're . . . scratched up. . . .  The closet door was off the wall in the closet and just laying down on the bed. . . . [M]y bed was . . . up against the

wall. [T]hey literally picked up my bed and put it against the wall.

Doc. [106-1] Ex. G, at 43-44, 47.

"The reasonableness requirement of the Fourth Amendment applies not only to prevent searches and seizures that would be unreasonable if conducted at all, but also to ensure reasonableness in the *manner and scope* of searches and seizures . . . that are carried out . . . pursuant to a warrant." *Ayeni v. Mottola*, 35 F.3d 680, 684 (2d Cir. 1994), *abrogated on other grounds* by *Wilson v. Layne*, 526 U.S. 603 (1999) (emphasis added).  Therefore, where as here, the entry into the premises is lawful, "excessive or unnecessary destruction of property in the course of a search may [nevertheless] violate the Fourth Amendment." *United States v. Ramirez*, 523 U.S. 65, 71 (1998).  However, not all damage to property pursuant to a lawful search is unreasonable within the meaning of the Fourth Amendment: "officers executing search warrants on occasion must damage property in order to perform their duty." *Dalia v. United States*, 441 U.S. 238, 259 (1979).

In *Cody v. Mell*o, 59 F.3d 13, 16 (2d Cir. 1995), the Second Circuit held that "[b]efore any due process liability can be imposed for property damages occurring in a lawful search, it must be established that the police acted unreasonably or maliciously in bringing about the damage" and that "[m]ere negligence is not enough."  As Judge Arterton noted recently, courts applying *Cody* in this District have been reluctant to resolve the issue at the summary judgment stage.  *Koller v. Hilderbrand*, 933 F. Supp. 2d. 272, 279-80 (D. Conn. 2013) ("Plaintiffs claim numerous items of property damage that, in aggregate, raise a genuine factual question about whether, under *Cody,* the police conducting the search acted reasonably and without malice.") citing *Notice v. Koshes,* 386 F. Supp. 2d 23, 27 (D. Conn. 2005) ("Whether the police officers' actions were unreasonable or malicious is a question of fact that cannot be resolved on a motion for summary judgment."); *Ochoa*

14

*v. City of West Haven,* No. 3:08cv00024 (DJS), 2011 WL 3267705, at *6 (D.Conn. July 29, 2011) (holding that the defendant officers were not entitled to summary judgment) (citing *Koshes,* 386 F.Supp.2d 23); *accord Diaz v. City of New York,* No. 00cv2944, 2006 WL 3833164, at *6 (E.D.N.Y. Dec. 29, 2006) (finding that while most photographs showed "damage consistent . . . with a reasonable search for narcotics," three photographs were less clear and therefore raised a genuine issue of material fact).[6]   *But see Dockery v. Tucker,* No. 97cv3584, 2008 WL 2673307, at *10 (E.D.N.Y. June 26, 2008) (holding that even if policemen personally caused the damage, they were entitled to summary judgment because there was no material dispute that the property damage did not go beyond what was necessary to effectuate the search); *Brown v. City of Utica,* 854 F.Supp.2d 255, 263 (N.D.N.Y.2012) ("[N]o rational trier of fact could conclude [from photographs] . . . that defendants acted unreasonably or maliciously when executing the search warrant.")).

Although not all damage to personal property pursuant to a lawful search is unreasonable, it is axiomatic that the "reasonableness of the damage must be evaluated with reference to the target of the search." *Koller v. Hilderbrand*, 933 F. Supp. 2d. at 278.  Thus while police searching for drugs or weapons in a home pursuant to a search warrant necessarily implies and sanctions a more thorough and intrusive search of the home and its effects, police, as here, performing a protective sweep incident to an arrest warrant are limited "to a cursory inspection of those spaces where a person may be found." *Maryland v. Buie,* 494 U.S. at 335.  Jayrado's deposition testimony, even in light of absence of photographic or other corroborating evidence, suffices to create a genuine issue of material fact as to whether Clark, Del Mauro and Puorro, acted "unreasonably or maliciously in

_____

[6]Although *Cody* deals with due process liability, the cases cited in this string citation have applied its standard to Fourth Amendment claims.

bringing about the damage" to his property.  *Cody v. Mell*o, 59 F.3d at 16.  Jayrado's testimony that

the Officers disassembled and damaged his Xbox suggests more than a protective sweep; rather, a

search for drugs which in the context would be unreasonable.  When considered in the aggregate,

evidence that his Xbox controller was "stomped on," his HDMI cord and television broken, his shoes

damaged, furniture amiss, and table broken, raise a genuine issue of material fact as to whether the

actions of those officers were, within the meaning of *Cody*, reasonable and without malice.

Although there are genuine issues of material fact concerning the protective sweep of the

apartment conducted by Clark, Del Mauro and Puorro, there is insufficient evidence in the record

to permit a reasonable juror to find that Hertler and Scirpo had an opportunity to intervene to prevent

their fellow officers from causing unreasonable property damage.  Those officers remained in the

hallway and hence could not have interceded during the course of the protective sweep.  Doc. [106]

at ¶ 42; Doc. [106-1]  Ex B. at 54.

### 4.      Search of Jayrado's Person

Separate and apart from the Officers' search of his apartment, Plaintiffs' claim for deprivation

of constitutional rights is also premised on the allegation that the Officers searched Jayrado's person

upon his return to the apartment building "without reasonable suspicion." Doc. [104] at 14 citing

*Terry v. Ohio*, 392 U.S.  1 (1968).  Because the Officers claim that they did not search Jayrado's

person, there is a factual dispute as to whether Jayrado was searched at all.[7]  To survive a motion

---

[7]Although the Court concludes that the parties dispute whether the Officers searched Jayrado, the Court notes that there are inconsistencies in Jayrado's version of events.  In Jayrado's first deposition, dated April 19, 2012, he testified as follows:

> Q.  Did they search you after you told them no?
> A.  No.  They made me turn my pockets out, if that counts as
> anything.  That's all they made me do, though.  They didn't,
> like, pat me down.

for summary judgment, however, Plaintiffs must do more than that make out genuinely disputed facts, they must establish genuine issues of fact *material* to their constitutional claim. If the Officers' search of Jayrado's person was not violative of his constitutional rights because the Officers had the requisite reasonable suspicion to search him, then whether or not a search occurred, although a factual dispute, is not material to a claim upon which relief can be granted. Thus, the dispute is material only if a search occurred without reasonable suspicion. In *Terry v. Ohio* the Supreme Court stated that in order for a search to be justified:

> [t]he officer need not be absolutely certain the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger. . . [I]n determing whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate

---

Q. Did they touch you?
A. No
Q. Okay.
A. And they said, I need to see your pockets.
Q. And you did that for them?
A. (Nodded head affirmatively.)
Q. Yes?
A. Yeah.

Doc. [93-14] at 41.

In a second deposition dated September 10, 2013, Jayrado stated: the Officers "told me to put my hands up against the wall and put my pizza on the floor. I put my pizza on the floor. And the he says, no, I have to check that pizza too. The other officer took the pizza, and then I got padded down. He said you don't have any weapons on you now, do you? I said, no, I just came back from getting pizza." Doc. [106-1] Ex. H at 25.

Jayrado's testimony from his second deposition comports with the version of events described elsewhere in the record. In his motion for appointment of counsel, dated December 6, 2011, he stated, the "Middletown police kicked off my door [and] search[ed] myself and apartment without a warrant." Doc. [14] at ¶ 12. In the civil complaint form her filed, *pro se*, in Connecticut Superior Court, he stated: "I went up stair[s] to my apartment on the fourth floor, and there I saw [s]everal Middletown Police officers standing in my hallway, and [s]everal coming out of my residence, with my door kicked off the hinges [a]nd on the floor. They asked me if I was Jayrado, to which I replied, yes. The officers [t]hen through [*sic*] me up against the wall, and search[ed] my person[]." Doc. [92-15] at 5.

> and unparticularized suspicion or 'hunch,' but to the specific
> reasonable inferences which he is entitled to draw from the facts in
> light of his experience.

*Terry v. Ohio*, 392 U.S. at 27.  At the core of *Terry* . . . is the common understanding that the Fourth

Amendment's reasonableness requirement is sufficiently flexible to allow officers who have an

objectively credible fear of danger to take basic precautions to protect themselves." *United States*

*v. Miller* 430 F.3d at 98 (interpreting *Terry* and its progeny).

Viewing the facts in the light most favorable to Plaintiffs, the Court concludes that there are

genuine issues of fact material to whether the Officers would have had reasonable suspicion to

search Jayrado.  The record contains no evidence that Jayrado, upon encountering the Officers, was

acting suspiciously or in any way that would indicate to the Officers that he was a threat to their

safety or the safety of others.  According to Puorro, Jayrado stated to the Officers, "[t]hat's my

apartment" and asked "what's going on?" Doc. [106-1] Ex. A at 74.  At that time, says Puorro, the

Officers "realized it was Jayrado." *Id.*  Yet under Jayrado's version of events he was nevertheless

frisked and asked if he had any weapons on his person.  Doc. [106-1] Ex. H at 74.  A reasonable jury

could conclude that the Officers were divested of reasonable suspicion to pat down Jayrado when,

by that time, they should have realized that Jayrado was not the violent suspect for whom they were

searching.

Thus, although the Officers' entry into Apartment D-11 was lawful, there are genuine issues

of fact material to the reasonableness of the Officers' search of Jayrado's person and the protective

sweep of the apartment conducted by Clark, Del Mauro, and Puorro.

**5.**   **Qualified Immunity**

The Officers claim that they are entitled to qualified immunity even if there are genuine

issues of material fact concerning the lawfulness of their actions. As indicated above, the Officers are entitled to qualified immunity if it was objectively reasonable for them to believe that their actions did not violate clearly established constitutional rights. *See Saucier v. Katz*, 533 U.S. 194, 202 (2001) ("if the officer's mistake as to what the law requires is reasonable . . . the officer is entitled to the immunity defense"); *Weyant v. Okst*, 101 F.3d at 856. The Court's qualified immunity analysis therefore "looks to the reasonableness of an officer's belief that he acted lawfully after the officer is found to have been unreasonable in his conduct." *Stephenson v. Doe*, 332 F.3d 68, 80 n. 15 (2d Cir. 2003); *Holeman v. City of New London*, 330 F. Supp. 2d 99, 118 (D. Conn. 2004) *rev'd in part, appeal dismissed in part*, 425 F.3d 184 (2d Cir. 2005) (citing same). Where "there are facts in dispute that are material to a determination of reasonableness" "[s]ummary judgment on qualified immunity grounds is not appropriate." *Thomas v. Roach,* 165 F.3d 137, 143 (2d Cir.1999).

With respect to the reasonableness of the Officers' search of Jayrado's person, the Court concludes that even if the totality of the circumstances were insufficient to give rise to reasonable suspicion, it would have neverthlesss been objectively reasonable for the Officers to believe that they were not violating Jayrado's constitutional rights. *See Holeman v. City of New London*, 425 F.3d 184, 191 (2d Cir. 2005) ("Even if the totality of facts were insufficient to satisfy probable cause or reasonable suspicion, [officer's] belief that they were was objectively reasonable, and therefore protected by qualified immunity"); *Cooper v. City of Hartford*, No. 3:07cv823, (JCH) 2009 WL 2163127, at *17 (D. Conn. July 21, 2009) (citing same and concluding officers who stopped automobile had objectively reasonable belief that stop was justified even though there were genuine issues of fact as to whether stop was supported by reasonable suspicion).

Any decision by the Officers to search Jayrado's person cannot be divorced from the nature

19

of their surroundings and the grave circumstances that brought the Officers to the apartment in the first place.  The Officers were endeavoring to arrest Perry, a man suspected of a violent crime.  They therefore had reason to be wary of Jayrado upon his return to the very apartment unit where they thought Perry lived.  They could have reasonably believed that Jayrado was an associate of Perry's who shared some of his violent tendencies, or even that Jayrado was one of the five other men, who along with Perry, were suspected of the violent beating and robbery of Molinaro.  The fact that Officers smelled marijuana, an illegal substance under most circumstances, could have reasonably contributed to their guarded impression of Jayrado and prompted a frisk of his person.  The Officers could also have reasonably anticipated that Jayrado was a threat to their safety, given that an aggressive reaction from one whose apartment door had been battered down by the police, and apartment searched, would not have been unforeseeable under the circumstances.

A search of Jayrado's person would have also been reasonably justified in light of the Officers' surroundings.  The need for a police presence at Sagamore Hills was so persistent that Officers had standing permission to enter the common areas of the building and were given a key or pass code for that purpose.  Scirpo, who was amongst those who could have searched Jayrado, testified that he been to Sagamore Hills on previous occasions "for larcenies, for breaking in cars, for investigations, [for] domestic[] [incidents], for police emergency examination calls."  Doc. [93-12] at 33.

Thus, while viewing the evidence in the light most favorable to Plaintiff it may have been that the Officers did not have reasonable suspicion to search Jayrado's person, the Officers' belief that they were permitted to pat down Jayrado was objectively reasonable under the circumstances.  Accordingly, the Officers are entitled to qualified immunity for any search of Jayrado.

Plaintiffs' version of events, however, that Clark, Del Mauro and Puorro exceeded the scope of a protective sweep (and unlawfully damaged his property), could not support a finding that it was objectively reasonable for those officers to believe their actions were not violating a constitutional right. *See Koller v. Hilderbrand*, 933 F. Supp. 2d. at 279 (collecting cases for the proposition that "courts in the District have been reluctant to resolve the issue [of whether police search was reasonable and without malice] at summary judgment"). Accordingly, Clark, Del Mauro and Puorro are not entitled to qualified immunity on Plaintiffs' claim that they exceeded the scope of a protective sweep. *Thomas v. Roach,* 165 F.3d at 143; *see also Maye v. Vargas*, 638 F. Supp. 2d 256, 261-62 (D. Conn. 2009) ("Although qualified immunity is a question of law, because issue of reasonableness depends on the facts of the situation, if there is a dispute as to the facts, that must be resolved by the factfinder before qualified immunity can be granted.")

Accordingly, the motion for summary judgment filed by Clark, Del Mauro and Puorro, who conducted the protective sweep, will be denied as to Count One. The motion for summary judgment filed by Hertler and Scirpo, who were not part of that search, will be granted as to that claim.

**B.    Municipal Liability under 42 U.S.C. § 1983**

Plaintiffs contend in Count Two that the City is liable under 42 U.S.C. § 1983 for the unconstitutional actions of the Officers. Because the Court has concluded that the Officers' entry into the common areas of the apartment, their entry into Apartment D-11, and any search of Jayrado's person was lawful, the only question for the Court to consider is whether the City may be liable for the Officers' protective sweep of the apartment unit.

The Supreme Court has held that a municipality cannot be held liable on a respondeat superior theory. *Monell v. Dep't of Social Services,* 436 U.S. 658, 691 (1978). The *Monell* Court

21

held that "a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents.  Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is liable under § 1983." *Id.* at 694.  Thus, to hold a municipality liable under 42 U.S.C. § 1983, a plaintiff must plead and prove that the asserted violation of a federally protected right was caused by a municipal policy, a municipal custom or practice, or the decision of a municipal policymaker with final policymaking authority. *City of St. Louis v. Praprotnik,* 485 U.S. 112, 123 (1988).  A plaintiff must further demonstrate that, "through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged." *Board of County Commissioners v. Brown,* 520 U.S. 397, 404 (1997) (emphasis in original).  "That is, a plaintiff must show that the municipal action was taken with the requisite culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Id.*

Where, as here, a subordinate municipal official is alleged to have committed the constitutional violation, the plaintiff must establish that the subordinate's conduct is attributable to the acts or omissions of officials with final policymaking authority.  *Amnesty America v. Town of West Hartford,* 361 F.3d 113, 126 (2d Cir.2004).  "Thus, where a policymaking official exhibits deliberate indifference to constitutional deprivations caused by subordinates, such that the official's inaction constitutes a 'deliberate choice,' that acquiescence may 'be properly thought of as a city policy or custom that is actionable under § 1983.'" *Id.*  (quoting *City of Canton v. Harris,* 489 U.S. 378, 387, (1989)).

Inadequate training can be a basis for municipal liability "in limited circumstances." *City*

*of Canton,* 489 U.S. at 387. "Only where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." *Id.* at 389. "[M]unicipal liability under § 1983 attaches where — and only where — a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Pembaur v. City of Cincinnati,* 475 U.S. 469, 483-84 (1986).

"In order to establish that a failure to train constitutes deliberate indifference to the constitutional rights of the public, a plaintiff must establish (1) that the policymaker knows 'to a moral certainty' that his employees will confront a given situation; (2) that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or there is a history of employees mishandling the situation; and finally (3) that the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights." *Wilson v. City of Norwich,* 507 F.Supp.2d 199, 210 (D.Conn. 2007) (citing *Walker v. City of New York,* 974 F.2d 293, 297-98 (2d Cir.1992)).

In addition to establishing that the purported failure to train occurred under circumstances that could constitute deliberate indifference, *City of Canton* requires that a plaintiff identify a specific deficiency in the municipality's training program and establish that the deficiency is "closely related to the ultimate injury," such that it "actually caused" the constitutional violation. 489 U.S. at 391. Thus, a plaintiff must establish that "the officer's shortcomings . . . resulted from . . . a faulty training program" rather than from the negligent administration of a sound program or other unrelated circumstances. *Id.* at 390-91. Further, it is not sufficient to show that only a particular

officer is unsatisfactorily trained, because "the officer's shortcomings may have resulted from factors other than a faulty training program."  *Id.* at 391-92.  With these principles in mind, the Court concludes as a matter of law that a deprivation of one's constitutional rights would be a direct and foreseeable consequence of the City's failure to train its officers on the most recent developments in the law concerning searches and seizures, and that proper training would prevent those types of constitutional violations.  *See Walker v. City of New York* at 974 F.2d at 297-98.  The only question therefore is whether the Officers were so instructed.

The City's motion for summary judgment is anchored primarily in the contention that its Officers were properly trained in the law as it relates to *entry* into residences for the purposes of effectuating an arrest warrant.  The City has appended to its motion for summary judgment the following evidence concerning the training its Officers received: the "Review Training Credit Reports" issued by the State of Connecticut Officer Standards and Training Council, for each Officer; deposition testimony of Elliot Spector, Esquire, who administered the City's officer training program; and an excerpt from the Officers' Field Manual, replete with citations to *Payton* and *Steagald*, and other oft cited cases relating to the permissibility of forced entry with and without an arrest warrant.  Docs. [92-9]; [92-10]; [92-11]; [92-12]; [92-13]; [92-14]; [93-9].  While this evidence indicates that the Officers received regular training, which in some instances included instruction on the circumstances in which forced entries into residences are permitted under *Payton* and *Steagald*, none of this evidence relates to the remaining issue for the Court to consider: whether the Officers were trained on the established law as it relates to the *nature and scope of protective sweeps* conducted pursuant to an arrest warrant.  It may well be that the Officers were so instructed, but the burden is on the City to show that *no* genuine issue of material fact exists on that score.  *See*

24

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986).  It has not done so here.[8]  Its motion for summary judgment on Count Two will therefore be denied.

    **C.**    **Governmental Immunity**

    The balance of Plaintiffs' claims against the Officers sound in state law.  Plaintiffs charge the Officers in Counts Three through Six with: violation of Article First, § 7 of the Connecticut Constitution, trespass, intentional infliction of emotional distress, and negligent infliction of emotional distress.  The Officers contend that for some of these claims they are entitled to summary judgment because their actions were discretionary in nature and thus subject to immunity under state law.  Although the Court agrees that the actions of the Officers in question were discretionary in nature, the Court concludes that in some instances certain recognized exceptions to the doctrine of governmental immunity might apply in the circumstances here.

    Connecticut law provides that:

> [A] municipal employee is liable for the misperformance of ministerial acts, but has a qualified immunity in the performance of governmental acts.  Governmental acts are performed wholly for the direct benefit of the public and are supervisory or discretionary in nature.  In contrast, ministerial refers to a duty which is to be performed in a prescribed manner without the exercise of judgment or discretion.

*Mulligan v. Rioux*, 229 Conn. 716, 727 (1994).  The determination of whether qualified immunity applies under Connecticut law is generally a question of law unless there exists unresolved material

---

    [8]The deposition testimony of Detective Nicholas Puorro suggests one fully versed on the nature and scope of protective sweeps.  Doc. [106-1] Ex. A at 61.  Officer Frank Scirpo also recognized that there are "differences between the search of property and the search of people."  Doc. [106-1] Ex. F at 26.  One cannot tell from the record however, whether Puorro or Scirpo, or the other officers for that matter, divined that knowledge from Providence, acquired it through self-study, or were the recipients of the City's formal instruction on the nature and scope of protective sweeps incident to an arrest.

issues of fact that are properly left to a jury's determination.  *Id.*  Where, as here, the actions of municipal employees are discretionary, *Gordon v. Bridgeport Housing Authority*, 208 Conn. 161, 180-81 (1988) (policing community and investigating those who break the law is discretionary function), governmental immunity will attach at the summary judgment stage unless there are issues of fact material to one of three exceptions: (1) where the circumstances make it apparent to the public officer that his or her failure to act would be likely to subject an identifiable person to imminent harm; (2) where a statute specifically provides for a cause of action against a municipality or municipal officer for failure to enforce certain laws; and (3) where the alleged acts involve malice, wantoness or intent to injure, rather than negligence.  *Purzycki v. Town of Fairfield,* 244 Conn. 101, 108 (1998).

"By its own terms, [the first exception] requires three things: (1) imminent harm; (2) identifiable victim; and (3) a public official to whom it is apparent that his or her conduct is likely to subject that victim to that harm."  *Doe v. Petersen*, 279 Conn. 607, 616 (2006).  "Although the cases involving police officers and this exception have involved *failures to act* causing harm to *third parties* . . . there is no reason that the person subject to imminent harm cannot be a person whom the officer is dealing with *directly*."  *See, e.g., Castorina v. Stewart,* No. CV 950324487, 1998 WL 309393, at *6 (Conn.Super. June 3, 1998) (issues of fact concerning officer's alleged assault and false arrest of plaintiff were material to whether the first exception applied) (emphasis added).  Therefore, the first exception applies not only to public officials whose failure to act harms foreseeable victims, but also to public officials whose actions immediately impact those they with whom they deal directly.  *See Holeman v. City of New London*, 330 F.Supp.2d at 118 (imminent harm exception could apply as to whether officers were negligent, in *inter alia*, shooting decedent);

*Galindez v. Miller*, 285 F.Supp.2d 190, 195 (D. Conn. 2003) (imminent harm exception could apply to whether officer's use of force on plaintiff was negligent).

In analyzing the remainder of Plaintiffs' claims, the Court will determine in the first instance, whether there are genuinely disputed facts on this record material to those claims, and, if so, whether the Officers are entitled to immunity for their conduct.

### D.    **Connecticut Constitution**

Plaintiffs charge the Officers in Count Three with deprivation of Jayrado's right under Article First, § 7 of the Connecticut Constitution, which mirrors the Fourth Amendment protection from unreasonable searches and seizures.[9]  Although the substantive similarities between the two constitutional provisions imply that Plaintiff's unreasonable search claim under the Connecticut Constitution would survive to the same extent the claim for unreasonable search survives under the Fourth Amendment, *Birdsall v. City of Hartford*, 249 F. Supp. 2d 163, 171-72 (D. Conn. 2003), leaving the Court to decide only the extent to which the Officers' actions are shielded by Connecticut immunities, the parties suggest that there is a more immediate question: whether Article First, § 7 creates a private right to sue for monetary damages under *the circumstances presented here*.

I emphasize the foregoing language because there is some disagreement in this District as to whether that provision creates a right to sue in every case, irrespective of the nature and degree of the allegedly violative conduct.  In *Binette v. Sabo*, 244 Conn. 23 (1998), the Connecticut Supreme Court, granting certification from this District, considered the following question:

---

[9]Article First, § 7 of the Connecticut Constitution provides: "The people shall be secure in their persons, houses, papers and possessions from unreasonable searches or seizures; and no warrant to search any place, or to seize any person or things, shall issue without describing them as nearly as may be, nor without probable cause supported by oath or affirmation."

"whether, in the circumstances presented, the Connecticut constitution gives rise to a private cause of action for money damages stemming from alleged violations of article first, §§ 7 and 9, of our state constitution."[10]  In that case, Joseph and Janet Binette, claimed that police officers entered their home without a warrant or their permission, pushed Mrs. Binette, which caused her to fall against a wall and over a table, repeatedly slammed Mr. Binnete's head against a car, and struck Mr. Binette in the head while he was lying on the ground experiencing an epileptic seizure.  *Id.* at 26.  The court answered the certified question in the affirmative, concluding that the Connecticut constitution gives rise to a private cause of action for monetary damages under Article First, §§ 7 and 9.  In concluding that it possessed the authority to create a private cause of action under its constitution, the court drew from the reasoning in *Bivens v. Six Unknown Names Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), which concluded that federal courts possess the power to create a private damages action directly under the federal constitution.  *Id.* at  33-50.  The court also found support "in the common-law antecedent to [the] state constitutional provisions against unreasonable searches and seizures."[11]  *Id.* at 33.

While recognizing a private right of action under Article First, §§ 7 and 9, the court said the following with respect to *other* constitutional provisions:

---

[10]Article First, § 9 states: "No person shall be arrested, detained or punished, except in cases clearly warranted by law."

[11]The court also cited to the Restatement (Second) of Torts as "authority to create a state constitutional remedy." *Id.* at 34.  The court stated: "'When a legislative [or constitutional] provision protects a class of persons by proscribing or requiring certain conduct but does not provide a civil remedy for the violation, the court may, if it determines that the remedy is appropriate in furtherance of the purpose of the legislation and needed to assure the effectiveness of the provision, accord to an injured member of the class a right of action, using a suitable existing tort action or a new cause of action analogous to an existing tort action.'" *Id.* quoting 4 Restatement (Second), Torts  § 874A (1979).

> [w]hether to recognize a cause of action for alleged violations of *other* state constitutional provisions in the future must be determined on a case-by-case basis. . . .  [T]hat determination will be based upon a multifactor analysis.  The factors to be considered include: the nature of the constitutional provision at issue; the nature of the purported unconstitutional conduct; the nature of the harm; separation of powers considerations and the other factors articulated in *Bivens* and its progeny; the concerns expressed in *Kelley Property Development, Inc.*; and any other pertinent factors brought to light by future litigation.

*Id.* at *48* (emphasis added).  Resolving a year later not to recognize a private cause of action under Article First, § 8 ("No person shall . . . be deprived of life, liberty or property without due process of law . . ."), the court noted that in *Binette*, it had expressly "declined to create an all-encompassing damages action for any and all alleged violations of state constitutional provisions."  *ATC Partnership v. Town of Windham*, 251 Conn. 597, 613 (1999).  Instead, it held that "whether such a cause of action should be recognized would be determined on a case[-]by-case basis."  *Id.*

Recognizing a private cause of action for monetary damages under Article First, § 7 in *Yorzinski v. Alves*, 477 F. Supp. 2d 461, 470-71 (D. Conn. 2007), Judge Arterton expanded upon the notion that *Binette* directed the question to be decided on a case-by case basis.  She stated:

> While *Binette* emphasized that its decision did "not mean that a constitutional cause of action exists for every violation of [Connecticut's] state constitution" and that "[w]hether to recognize a cause of action for alleged violations of *other* state constitutional provisions in the future must be determined on a case-by-case basis," *Binette* did not . . . impose a limitation on claims based on claimed police search and seizure violation of § 7.

*Id.* 470-71.  Noting that same year that there was "little need for an extensive discussion on this issue," Judge Squatrito quoted that explication verbatim in *Milardo v. City of Middletown*, No. 3:06cv01071 (DJS), 2009 WL 801614 (D. Conn. Mar. 25, 2009).  The court in both *Yorzinksi* and *Milardo* ruled that a private cause of action exists under Article First, § 7 notwithstanding the fact

that the conduct of police officers in neither case was egregious by *Binette* standards.  In *Yorzkinsk*, the officers were alleged to have arrested the plaintiff without probable cause and to have conducted an unlawful protective sweep of his apartment.  *Yorzinski v. Alves*, 477 F. Supp. 2d at 463-464.  In *Milardo*, the officers entered a private residence and the bedroom of a minor without a search warrant or the permission of the plaintiffs.  *Milardo v. City of Middletown*, 2009 WL 801614 at *1-2. There was no allegation in either case that the officers caused physical harm or property damage.

Judge Arterton's analysis in *Yorzinski* underscored what *Binette* had stated expressly: that whether or a not a private cause of action exists for constitutional provisions other than Article First, §§ 7 and 9 should be determined on a case by case basis.  It also made obvious what she viewed as implicit in that holding: that there is an *unconditional* private cause of action under Article, First §§ 7 and 9.  However, that analysis did not consider a decision issued a number of years earlier by the Connecticut Appellate Court, which to date remains the last word from a  Connecticut appellate court on the permissibility of a *Binette* claim under Article First, § 7.  *Martin v. Brady*, 64 Conn. App. 433, 440, 780 A.2d 961, 966 (2001) *aff'd*, 261 Conn. 372, 802 A.2d 814 (2002).  In *Martin*, the court considered whether the doctrine of sovereign immunity barred the plaintiff from pursuing claims under Article First, §§ 7 and 9 against the defendants, state police officers, who he alleged had forced their way into his home without a valid search warrant, smashed his windows and broke down his doors, struck him and threw him to the floor after he submitted to arrest.  *Id.* at 437.  The plaintiff had not filed with the claims commissioner a claim for permission to bring suit and dissolve sovereign immunity.  Consequently, the trial court concluded that because of sovereign immunity, and the plaintiff's failure to exhaust administrative remedies, it lacked subject matter jurisdiction over the claim.  In his appeal to the Appellate Court, the plaintiff argued that *Binette* created a claim

for relief that invoked an exemption from filing suit with the claims commissioner under General

Statutes § 4-142.  The Appellate Court affirmed the judgment of the trial court, concluding that the

plaintiff's claims were barred by sovereign immunity, and furthermore, that the facts alleged were

not sufficiently egregious to state a cause of action under *Binette*.  *Id.* at 438.  Distinguishing the

allegations in that case from the complaint in *Binette*, which it noted "was sustained *because* of an

unreasonable, egregious search and seizure," *id.* at 441 (emphasis added), the court stated:

> there was nothing egregious about the remainder of the alleged
> misconduct that was asserted in the complaint.  The plaintiff has not
> challenged the validity of the . . . "arrest warrant." . . . Apart from the
> legality of the entry the plaintiff complains of having been pushed to
> the ground . . . and of having windows and doors smashed. . . . We
> are not persuaded that these allegations, if true, rise to the level of
> egregious misconduct.  They are far removed from the allegations of
> misconduct that underlay *Binette*.

*Id.* The Court Supreme Court, which affirmed the decision of the Appellate Court on other grounds,

did not reach the issue of whether the Appellate Court had correctly applied *Binette*: the *Martin*

court noted that at oral argument, plaintiff conceded that *Binette* did not apply because, as it turned

out, he sued the officers in their *individual*, rather than their *official* capacities.  *Martin v. Brady*, 261

Conn. 372, 374 (2002).

Notwithstanding the decisions of Judge Arterton and Judge Squatrito in *Yorzinski* and

*Milardo*, other judges in this District have relied on *Martin*, in part, for the proposition that a private

right of action should be recognized under Article First, § 7 only where the conduct of officers is

egregious to the degree illustrated by *Binette*.  More recently, Judge Hall observed in *Marshall v.*

*Town of Middlefield*:

> Connecticut courts have emphasized the extreme nature of the alleged
> conduct in *Binette* and declined to recognize a private right of action
> for less egregious violations. *See, e.g., id.* at 613 (noting that the

*Binette* decision was made "in the context of allegations of an egregiously unreasonable search and seizure"); *Bauer v. City of Hartford,* No. 3:07–cv–1375 (PCD), 2010 WL 4429697, at *12 (D.Conn. Oct. 29, 2010) (holding that, even if the defendant police officers' entry into the plaintiff's home "were illegal ... that fact does not rise to the level of egregiousness necessary to sustain a claim under the Connecticut Constitution"); *Faulks, Jr. v. City of Hartford,* No. 3:08–cv–270 (VLB), 2010 WL 259076, at *10 (D. Conn. Jan. 19, 2010) (finding no right of action where defendant officers' alleged misconduct "involve[d] no physical confrontation akin to the level of force at issue in *Binette* "); *Martin v. Brady,* 64 Conn. App. 433, 442 (2001) ("Apart from the illegality of the entry, the plaintiff complains of having been pushed to the ground on one occasion and of having windows and doors smashed on another occasion. We are not persuaded that these allegations, if true, rise to the legal of egregious misconduct.").

*Marshall v. Town of Middlefield*, No. 3:10cv1009 (JCH), 2012 WL 601783, * 8 (D. Conn. Feb. 23, 2012) *reconsideration denied*, No. 3:10cv1009 (JCH, 2012) WL 1118950 (D. Conn. Apr. 3, 2012). In that case, the court held that the conduct alleged by the Town Constable, that he entered a private driveway and detained the plaintiff without reasonable suspicion, was "insufficiently egregious to justify a *Binette* claim," and granted summary judgment with respect to plaintiff's claim under Article First, §§ 7 and 9. *Id.* at 9.

In the case at bar, Plaintiffs' allegation that the Officers exceeded the lawful scope of their authority in conducting a protective sweep of Apartment D-11 suggests actions that are unreasonable or even malicious, but it does imply conduct that is egregious within the meaning of *Binette*. Therefore, the limitation recognized in *Marshall*, which suggests that claims under Article First, § 7 require allegations of sufficiently egregious police conduct in order to proceed, would have a preclusive effect on Plaintiffs' claims in this case that are predicated on the Officers' lesser transgressions.

Although the judge in *Marshall* observed that "Connecticut courts have . . . declined to

recognized a private right of action [under Article First, § 7] for less egregious violations" than the facts alleged in *Binette*, *id.* at 8, neither *Marshall* nor the other cases in this District it relied on for that proposition, *Bauer* and *Faulks*, provided citation to, or analysis of, *Yorzinski* and *Milardo*, which seem to have been disregarded by the later cases. In these circumstances, I am respectfully unable to agree with the court's statement in *Marshall* that courts in this District have "declined to recognized a private right of action [under Article First, § 7] for less egregious violations." *Id.* at 8. No state court, appellate or trial, has, since *Martin*, revisted *Binette* in any way that provides guidance on this question. Upon consideration, I think there is some doubt as to whether *Binette* limited a private cause of action for monetary damages under Article First, §§ 7 and 9 to the particular, compelling circumstances of that case.

There are several reasons that may have contributed to the Connecticut Appellate Court in *Martin* and many of the courts in this District to reach that conclusion. First, *Binette* granted certification of whether "*in the circumstances presented*," there was a private cause of action for money damages under the constitutional provisions in question. *Binette v. Sabo*, 344 Conn. at 25. Second, the court was careful to limit its holding to Article First, §§ 7 and 9, only, and cautioned that whether there is a private right to sue under "other state constitutional provisions in the future must be determined on a case-by-case basis," a statement exploited by defendants for the proposition that *Binette* imposed a limitation on all claims based on Article First, §§ 7 and 9. *See e.g.*, *Yorzinski v. Alves*, 477 F. Supp. 2d at 471-72. Third, in dicta found in a footnote, the *Binette* court characterized the actions of the officers as "egregious misconduct." *Binette v. Sabo*, 244 Conn. at 50 n. 23. The court in *Bauer* keyed in on that language for the proposition that, "[i]n recognizing the existence of a cause of action for money damages, the court was influenced by the officers' egregious

misconduct." *Bauer v. City of Hartford,* 2010 WL 4429697, at \*12 citing *Binette v. Sabo*, 244 Conn. at 50 n. 23; *see also Martin* v. *Brady*, 64 Conn. App. at 441.

It is problematic to read *Binette* as a holding by the Connecticut Supreme Court that the state's Constitution safeguards individuals against egregious police searches and seizures only, and has nothing to do with police conduct which, while unreasonable, does not rise to (or more precisely, sinks to) that level of depravity.  Nothing on the face of Article First, § 7 of the Connecticut Constitution, when compared to the Fourth Amendment to the United States Constitution, states or implies that the state provision affords the citizens of Connecticut a lower of level of protection than the federal counterpart, which historically "establishes a *minimum* national standard for the exercise of individual rights."  *State v. McKenzie–Adams*, 281 Conn. 486, 509 (2007) (internal quotation marks omitted) (emphasis added).  Furthermore, had the court in *Binette* meant for only egregious searches and seizures to be actionable under Article First, § 7, it would have been departing from the recent trend in its Article First, § 7 jurisprudence, which has recognized "*greater* protection than the [F]ourth [A]mendment to the United States Constitution," not less.  *State v. Davis*, 283 Conn. 280, 305-06 (2007) (emphasis added) citing *State v. Miller,* 227 Conn. 363, 377 (1993) (Article First, § 7, requires police to obtain warrant to search impounded automobile); *State v. Geisler,* 222 Conn. 672, 691-92 (1992) (emergency exception to warrant requirement is narrower under Article First, § 7, than under federal constitution); *State v. Marsala,* 216 Conn. 150, 171 (1990) (good faith exception to warrant requirement does not exist under Article First, § 7, of state constitution); *State v. Dukes,* 209 Conn. 98, 120-21 (1988) (search incident to arrest exception to warrant requirement is narrower under Article First, § 7, than under federal constitution).

Although the *Binette* court considered the question under the "circumstances presented" and

noted the "egregious misconduct" of the officers, there is little in the decision to suggest that the Court would have reached an opposite result had the officers' actions been merely unreasonable. The court for example, found support for the creation of the cause of action in the "common-law antecedents to [the] state constitution," yet the common law prior to the creation of the Connecticut constitution did not require one to furnish evidence of the egregious misconduct of public officials in order to sustain a lawsuit for unreasonable searches or seizures. *Binette v. Sabo*, 244 Conn. at 33-34 (citing collected cases). Nor was the egregious misconduct of federal agents the justification for the private cause of action under the Fourth Amendment recognized in *Bivens*. That decision was based partly on the recognition that the Fourth Amendment proscribes certain conduct that is not necessarily prohibited at common law, *Bivens*, 403 U.S. at 393, but not that the actions of offending federal agents must be sufficiently egregious in order to be redressable under the Fourth Amendment. To limit a private cause of action under Article First, §§ 7 and 9 is difficult to reconcile with authority determinative of *Binette's* holding, in which the conduct of officers, egregious or otherwise, was of no moment.

The Court is respectful of the Connecticut Appellate Court's decision in *Martin.* It represents a Connecticut appellate court's most recent analysis of Article First, §§ 7 and 9 claims under *Binette.* In the circumstances presented here, however, the Court agrees with what was implicit in *Yorzinski* and *Milardo*: that this District is not bound by it. When "a federal court must determine state law, it should not slavishly follow lower or even upper court decisions but ought to consider all the data the highest court of the state would use." *Roginsky v. Richardson-Merrell, Inc.*, 378 F.2d 832, 851 (2d Cir. 1967). Guided by this principle, this Court concludes that *Binette* should not be read so as to restrict the private right of action under the constitutional provisions at issue. Further, I am

influenced by the fact that the judges who have recently considered the question in this District did not acknowledge or analyze *Yorzinski* and *Milardo,* or reconcile their conclusions to the contrary rulings in those cases, an oversight which undermines the suggestion of those courts that the question had been settled. After consideration, I conclude that a private right of action exists under Article First, § 7 of the Connecticut Constitution, without being fettered by or required to replicate the particular, egregious police conduct which underlay *Binette.* Accordingly, Plaintiffs may proceed under that theory against the Officers.

Absent a showing by the parties that substantive differences in the Article First, § 7 and the Fourth Amendment would affect the outcome of the case, the claims are subject to the same analysis. *Warren v. City of Waterbury*, No. 3:09cv01616 (AWT), 2012 WL 827051, * 3 (D. Conn. Mar. 9, 2012); *Cooper v. City of Hartford*, 2009 WL 2163127, at *22. Accordingly, the Court adopts its conclusions with respect to Plaintiffs' Fourth Amendment claims set forth in the discussion above, and concludes that there are genuine issues of fact material to whether the Officers conducted a lawful search of Jayrado' person, and whether the protective sweep of Apartment D-11 by Clark, Del Mauro, and Puorro was reasonable and without malice. Because, however, qualified immunity is not available under a claim arising from state law, the Court must determine whether the Officers are entitled to immunity for these actions under Connecticut law. This analysis turns on whether there are genuine issues of fact material to whether the Officers subjected Jayrado to "imminent harm" or acted with "malice, wantoness or [an] intent to injure." *Purzycki v. Town of Fairfield,* 244 Conn. at 108.

Any search the Officers may have conducted of Jayrado's person was not malicious, wanton or driven by an intent to injure, nor did it subject Jayrado to imminent harm, which requires a

showing of physical harm or personal danger. *Chipperini v. Crandall*, 253 F. Supp. 2d 301, 312 (D. Conn. 2003) ("Although [the imminent harm] exception to governmental immunity is not well developed in Connecticut law it appears that the type of harm required is physical harm or personal danger."); *Milardo v. City of Middletown*, No. 3:06cv01071 (DJS), 2009 WL 801614 (D. Conn. Mar. 25, 2009) (citing *Chipperini* and concluding that imminent harm exception did not apply to officers who may have unlawfully entered residence).  Accordingly, the Officers are entitled to immunity on Plaintiffs' claim under the Connecticut Constitution that the Officers did not have reasonable suspicion to search Jayrado's person.

The Court concludes, however, that there are genuine issues of fact material to whether the protective sweep of Apartment D-11 by Clark, Del Mauro and Puorro was malicious or wanton. Jayrado's deposition testimony indicates that those officers exceeded the scope of their lawful authority in conducting a protective sweep of the apartment unit, and qualifies as circumstantial evidence probative of the actionable intent of those officers.  Viewing the evidence in the light most favorable to Plaintiffs, the Court cannot conclude that the Officers are entitled to immunity based on that conduct.

The motion for summary judgment filed by Clark, Del Mauro and Puorro dismissing plaintiffs claim in Count Three will be denied.  The motion for summary judgment filed by Hertler and Scirpo, who did not participate in the protective sweep, will be granted as to that claim.

### E.    Trespass

Plaintiffs charge the Officers with trespass in Count Four.  Although styled as garden-variety "trespass," the Court construes Count Four as asserting separate claims of trespass to land, and trespass to chattel, based on the supporting allegation that "[t]he Officers caused direct injury to

[Jayrado's] apartment and . . . personal property contained therein."  Doc. [48] at ¶ 61.  Plaintiffs specifically contend that the Officers became liable for trespass when they entered the apartment building, and also when Clark, Del Mauro, and Puorro entered Apartment D-11 and exceeded the scope of the protective sweep.  Plaintiff also raise for the first time, in their opposition to Hertler's and Scirpo's motion for summary judgment, that Hertler and Scirpo are liable for aiding and abetting the unlawful search of the apartment unit by Clark, Del Mauro, and Puorro.  Although, as Defendants correctly point out, "'a party may not raise new claims for the first in opposition to summary judgment,'" the Court considers Plaintiffs aiding and abetting claim to be ancillary to Plaintiffs' trespass claim, and will entertain in it in this disposition.  Doc. [111] quoting *Brandon v. City of New York*, 705 F. Supp. 2d 261, 278 (S.D.N.Y. 2010).

Under Connecticut law, trespass to land has four elements: (1) an ownership or possessory interest in land; (2) invasion, intrusion or entry by the defendant affecting the plaintiff's exclusive possessory interest; (3) intentional intrusion or invasion; and (4) direct injury as a result of the alleged invasion or intrusion.  *Bristol v. Tilcon Minerals*, *Inc*. 284 Conn. 55, 87 (2007); *see also Milner v. Duncklee*, 460 F. Supp. 2d 360, 380 (D. Conn. 2006).  Connecticut law defines trespass to chattels as "intentionally dispossessing another of the chattel, or using or intermeddling with a chattel in the possession of another." *Simms v. Chaisson*, 277 Conn. 319, 331 (Conn. 2006); *Bowers v. United States*, 931 F. Supp. 2d 358, 370 (D. Conn. 2013) (citing same).  The elements of aiding and abetting are: "(1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; (3) the defendant must knowingly and substantially assist the principal violation." *Efthimiou v. Smith*, 268 Conn. 499, 505 (2004).

38

An officer has a privilege to trespass upon property, pursuant to an arrest warrant, if the entry comports with constitutional limitations.  *See* Dockery *v. Tucker*, 2008 WL 2673307 at *11; *Voskerchian v. United States*, No. 98cv0335 (EM), 1999 WL 66709, at *4 (W.D.N.Y. Feb 10, 1999). The Court has concluded that the entry onto the premises was lawful, but that there are genuine issues of fact material to whether Clark, Del Mauro, and Puorro exceeded the scope of a protective sweep of the apartment unit by damaging Jayrado's personal effects.  These conclusions require as a matter of law that Plaintiffs trespass to land claim against the Officers be dismissed, and that Plaintiffs' trespass to chattel claim survives this motion as to Clark, Del Mauro, and Puorro.[12] Although police officers who makes entry onto private property in the performance of official duties are generally not considered trespassers, *Roberts v. Rosenblatt*, 146 Conn. 110 (1959), genuine issues of material fact concerning whether the actions of Clark, Del Mauro, and Puorro were malicious or wanton imply conduct outside the scope of official police business.  Further, because there are genuine issues of fact material in that respect, the Court concludes that Clark, Del Mauro and Puorro are not entitled to immunity to the trespass to chattel claim.

The Court, however, has also concluded as a matter of law that Herlter and Scirpo did not personally search Apartment D-11 and would not have had an opportunity to intervene to prevent any damage to Jayrado's personal property by their fellow officers.   Consequently, Hertler and

---

[12]Plaintiffs may recover under a theory of trespass to chattel for damage to personal property, not to fixtures of the apartment unit. *See ATC Partnership v. Town of Windham,* 268 Conn. 463, 487 (2004) (distinguishing between fixtures and chattels and noting that "[f]ixtures, *a legal part of the realty without the independent character of 'goods or chattels,'* are not included within the scope of [Connecticut's] replevin statute.") (emphasis added); *see also New York Life Ins. Co. v. Allison,* 107. F. 179, 185–86 (2d Cir.1901) (looking to the removability of an annexation in order to determine whether it is sufficiently affixed to the property so as to become a fixture); *see also Oliphant v. Villano*, No. 3:09cv862 (JBA), 2012 WL 3779160 (D. Conn. Aug. 31, 2012) (citing same and concluding that doorframe is not a "chattel" within the meaning of the common law).

Scirpo could have neither been aware that Clark, Del Mauro and Puorro were committing a tortious activity nor could have knowingly or substantially assisted in that endeavor, requirements under Plaintiffs' aiding and abetting theory.  Accordingly, their motion for summary judgment dismissing Count Four will be granted.

###### F.    Intentional Infliction of Emotional Distress

Plaintiffs charge the Officers in Count Five with intentional infliction of emotional distress. In order to sustain a claim of intentional infliction of emotional distress under Connecticut law, it must be shown: (1) that the actor intended to inflict emotional distress; or that he knew or should have known that emotional distress was a likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress and (4) that the emotional distress sustained by the plaintiff was severe. *Peytan v. Ellis,* 200 Conn. 243, 253, 510 (1986), *superseded by statute on other grounds as recognized in Chadha v. Charlotte Hungerford Hosp.,* 272 Conn. 776 (2005).  "Whether a defendant's conduct is sufficient to satisfy the requirement that it be extreme and outrageous is initially a question for the court to determine." *Appleton v. Bd. of Educ. of Town of Stonington,* 254 Conn. 205, 210 (2000).  "'Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'"  *Id.* at 210–11,  (citing 1 Restatement (Second) of Torts § 46, comment (d) (1965)).

Construing the evidence in the light most favorable to Plaintiffs, the record reveals that Jayrado returned home to discover that the Officers had battered down his door, broken his table, and destroyed several of his electronic devices in their sweep of the apartment, searched his person

without reasonable suspicion, and derided him when he asked to speak with his mother.  Thereafter, Jayrado's mood shifted more frequently, he felt on edge, unsafe in public and subject to harassment by the police.  Doc. [106-1] Ex. H 46-48.  His dosages of Ambien, Depakote and Risperdal were increased by his health care provider to accommodate his change in mood.  *Id.* at 47; Doc. [96]. Moreover, his mother thought that he had been traumatized.  Doc. [106-1] Ex. I at 27.  This version of events suggests extreme and outrageous conduct by law enforcement officials that directly resulted in Jayrado's severe emotional distress and a magnification of the symptoms of his bipolar disorder.  It also suggests the requisite intent of not only Clark, Del Mauro and Puorro, who searched the apartment, but also Hertler and Scirpo, who were among those who "derided" Jayrado.[13]  It is therefore a question for the jury as to whether or not the actions of the Officers were malicious or wanton within the meaning of the recognized immunity exception.  The Officers' motion for summary judgment dismissing Plaintiffs' claim of intentional infliction of emotional distress will be denied.

### G.   Negligent Infliction of Emotional Distress

In Count Six, Plaintiffs charge both the Officers and the City with negligent infliction of emotional distress.  Although the Court's conclusions concerning Plaintiffs claims for intentional infliction of emotional distress suggest a colorable claim under a negligence theory, the Court concludes as a matter of law that the Officers are entitled to immunity for this claim.  Unlike malicious, wanton, or intentional actions intending injury, which preclude governmental immunity,

---

[13]Jayrado testified during deposition that *all* of the Officers were verbally abusive to him. Doc. [106-1] Ex. H at 26.  This testimony suffices to create a genuine issue of material fact notwithstanding the allegation contained in the original state court complaint filed, *pro se*, that only "[o]ne of the officers" was "verbally abusive."  Doc. [1] at 8

there is no exception to the general rule of immunity for those actions which are merely negligent in nature.  Further, because the Officers are entitled to immunity on this allegation, *a fortiori* the City cannot be found vicariously liable for the negligence of the Officers.  Plaintiffs may find the reprieve they seek in a claim for intentional infliction of emotional distress.

Defendants' motion for summary judgment dismissing Plaintiffs' claim of negligent infliction of emotional distress in Count Six will be granted.

## IV.  CONCLUSION

For the foregoing reasons, the Court disposes of the pending motions as follows:

1. Hertler and Scirpo's Motion for Summary Judgment (Doc. # 90) is GRANTED IN PART AND DENIED IN PART.  It is GRANTED as to Counts One, Three, Four, and Six.  It is DENIED as to Count Five.

2. The City's Motion for Summary Judgment (Doc. # 87) is GRANTED IN PART AND DENIED IN PART.  It is GRANTED as to Count Six.  It is DENIED as to Count Two.

3. Clark's, Del Mauro's and Puorro's Motion for Summary Judgment (Doc. # 89) is GRANTED IN PART AND DENIED IN PART.  It is GRANTED as to Count Six. It is DENIED as to Counts One, Three, Four, and Five.

4. Defendants' Motion to Dismiss (Doc. # 65) is GRANTED IN PART AND DENIED IN PART.  It is GRANTED as to Count Six.  It is DENIED as to Counts Two, Three and Five.

5. Defendants shall file their responsive pleading within 14 days of this Ruling as required by Fed. R. Civ. P. Rule 12(a)(4)(A).

6.      The parties shall file their Joint Trial Memorandum on or before December 10, 2014.

7.      The case shall be trial ready by January 12, 2015.

IT IS SO ORDERED.

Dated:  New Haven, Connecticut
            September 29, 2014


                                            /s/ Charles S. Haight, Jr.
                                            CHARLES S. HAIGHT, JR.
                                            Senior United States District Judge

43